## Case No. 5,066.

FRATES et al. v. HOWLAND.

[2 Lowell, 36.] [2]

District Court, D. Massachusetts. Aug., 1871.

G. H. Palmer and C. T. Bonney, for libellants.

E. L. Barney, for respondent.

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

LOWELL, District Judge. I am not aware of any law which requires the original contract of seamen in the whaling service to be in writing; because the voyage is not "foreign" within the act of 1790 [1 Stat. 145]; Taber v. U. S. [Case No. 13,722]; The Atlantic [Id. 620]; Curt. Merch. Seam. 60. But the statutes of April 4, 1840 [5 Stat. 370], and July 20, 1840 [5 Stat. 394], which concern the treatment of seamen on a voyage, and their discharge, and even the shipment of men in the course of the voyage, as well as the return of seamen to the home port, are applicable to this branch of business. Bates v. Seabury [Case No. 1,104]; The Antelope [Id. 484]; The Louisa A. [Id. 8,530]. So that if there is a written contract, as there always is and should be, the act of 20th July, 1840, requires a true copy of it to be taken by the master; and this is, for all consular purposes, conclusive evidence of the contract, and regulates the dealings between the parties in the course of the voyage; and men shipped during the voyage, if shipped at a consular port, have the right to require a compliance with the eighth clause of the act. In this case the paper signed by the foremast hands did not state their contract truly; and although there may have been no necessity that the men should sign articles, yet it was fraudulent conduct on the part of the agent to induce them to sign two different contracts, one of which only, and that the false one, was furnished to the collector and carried on the voyage. So far as the parties are concerned, the objections to such a course are many. A seaman might be disabled, or might be discharged at a foreign port by consent, and the consul could not know how the settlement should be made with him. The reason given in the argument, that the owner in case of desertion would be bound to pay the forfeited wages to the United States, and wished to deceive them, does not recommend itself very strongly to the consideration of a court of justice. It was testified that owners sometimes promise a slightly increased lay, on conditions like those found in this contract, as a premium for good conduct; and I do not know that there is any objection to this, if done in good faith, and if the original lay is a fair and honest one agreed to by the parties. But the same intelligent witness who spoke of this custom, had never heard of any such difference as that between one three hundred and fiftieth and one two hundred and tenth, nor of any real lay as small as the former. It is plain that the shipping articles are a mere fiction in this particular.

Under these circumstances, I must, of course, construe these special contracts, made for the exclusive benefit of the owners, most strongly against them, and set aside any conditions that may be oppressive.

Both parties have agreed, that, for the purposes of this case, the lays mentioned in the special contracts are to be the basis of settlement; but the men dispute the deduction of seventy-five dollars. It appears that this was in lieu of certain charges, which are said to be usual; namely, for fitting and discharging the vessel, and for interest and insurance on the advances. Judge Sprague has repeatedly disallowed all of these charges excepting interest; and I do not see how I can allow them, unless it shall appear that some changes in the shipping articles or in the course of trade have changed the aspects of the question, which I neither affirm nor deny, for I am not informed upon the matter. I should be glad to have all question of charges carefully examined before the assessor, if the parties are willing to assume the burden. See Lovrein v. Thompson [Case No. 8,557]; Bates v. Seabury [Id. 1,104].

The other question is one of great importance and of some difficulty. The evidence shows, and the libellants admit, that what is now article 9 of the ordinary contract, authorizing the master to ship home oil and bone, is useful and advantageous to all parties, if, indeed, it is not essential to the prosecution of the particular sort of enterprise undertaken in this case; and I have recognized its validity in former cases. The decision of Judge Sprague, that under the older form of contract all such shipments were at the risk and expense of the owners, may have led to the change. But the question now arises for the first time, whether the owners are bound to sell the oil and bone on its arrival. It has been repeatedly decided by my predecessor, and by me, that the owners must account for the oil brought home, on its arrival, and cannot wait for changes of market. The main reason for this decision is, that the seamen cannot wait the issue of the mercantile enterprise after their own part in it is ended. Their right is to wages regulated by the catch, and these wages are payable on the return of the vessel. The owners retain the property in the oil, and need not sell it, if they account for it at the cash value. Under the ninth clause, the oil and bone are to be shipped home for sale; but is there any time at which the sale must be made short of the return of the vessel, or other termination of the voyage? Upon reflection, I am not able to fix any time short of that. The main purpose of this clause appears to be to exclude the conclusion that the owners are bound to get the oil home at their own expense; for there is coupled with the agreement that they may ship oil on freight, the further stipulation, that if their vessel earns freight in a similar way the seamen shall share it. The owners have a certain quantity of oil which they might, perhaps, bring home, but which it is convenient to send home. I should probably hold that they were bound to insure it, and that, if lost, they must account for its value. But when it reaches home, it seems to me they may hold it as part of the proceeds of the

voyage, if in good faith and in the exercise of their own best judgment they deem it wise for all parties to do so. It is not a consignment; and the seamen would, perhaps, have no right to order the owners to sell or not to sell; though this I do not decide. If instructions were sent on, the owners would be likely to follow them, because the seamen could not then complain of the result. When the market is falling, as has now been the case for five years, the result of holding is most unfortunate. But on a rising market it would be different, and I must fix some definite and absolute rule. Either they must always sell, or they may always control the latter. I cannot see my way to the decision that they must do the former. The argument was much pressed, that one consideration operating with the seamen to accept article 9 as part of their contract was, that a fund was thus put into the owners' hands to stop the charges of interest and insurance upon the advances. I admit that there is force in this argument; and it may be that the interest and insurance on advances, if otherwise valid, ought to cease from the time that the owners have in their hands any oil or bone from which they might have reimbursed themselves, if they had chosen to do so. This is one of the points which may come up hereafter. Interlocutory decree for libellants. Wages to be assessed.